Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms and adopts the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On 6 October 1998, the date of the alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On said occasion, an employer-employee relationship existed between defendant and plaintiff.
3. On said occasion, defendant was self insured with Hewitt Coleman 
Associates, Inc., as its third party administrator.
4. Plaintiff's average weekly wage was/is $402.97 and is subject to verification by a properly executed Form 22. The Pre-Trial Agreement dated 4 April 2000 which was submitted by the parties is incorporated by reference.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was 26 years old on the date of hearing before the Deputy Commissioner, began working for defendant in November 1996 as a dispatcher for the police and fire departments of defendant. Her job involved taking both emergency and non-emergency telephone calls and entering information into a computer. She worked in the basement Communications Room of the municipal building.
2. Renovations began on the municipal building in May or June 1998. The first stage of the renovation process involved demolition of certain existing structures, including walls and elevator shafts. As the demolition activities progressed, gasoline and diesel powered equipment was used by the contractors. Generators and compressors were left running in the shop area located below the communications department where plaintiff worked. Forklifts and other heavy equipment were also used around the building, particularly in the shop area. There were open pipes in the floor which allowed fumes from the shop area to come into the communications department. Although plaintiff noticed the unpleasant odor, neither she nor her coworkers considered the potential exposure risks, and no one with the city or the contractors was monitoring the air in the building.
3. Plaintiff was diagnosed with diabetes when she was eight years old. During her employment with defendant, plaintiff was dependent upon insulin for control of her blood sugar. Her condition became more complicated when she became pregnant in early 1998. Due to risk factors associated with her diabetes and renal complications, with a family history of cystic fibrosis and Down's syndrome, and with mitral valve prolapse, plaintiff's physician, Dr. Stephen Nickisch, referred plaintiff to Dr. Micki Cabaniss, a specialist in maternal fetal medicine.
4. Plaintiff presented to Dr. Cabaniss on 27 May 1998. Dr. Cabaniss examined plaintiff and found her condition to be well controlled. She recommended a care plan to Dr. Nickisch, plaintiff's regular obstetrician. Dr. Cabaniss next saw plaintiff on 6 July 1998 and plaintiff's blood sugars were improved, but not ideal. Plaintiff's baby was growing well and did not appear to have any defects. At their next examination on 5 August 1998, plaintiff did not have as good a diabetes control and she had had a recent exposure to Streptococcus.
5. In late August, plaintiff was hospitalized because her blood sugar was out of control. She was treated by an endocrinologist who recommended that she have set working hours through the remainder of her pregnancy so that she could maintain a schedule for eating and rest. Consequently, plaintiff was taken off the rotating shift schedule and given set working hours from 9:30 to 6:00.
6. Plaintiff returned to Dr. Cabaniss in early September 1998 for a follow-up after her hospitalization. Plaintiff had undergone a number of changes in her insulin program, and her kidney status was stable. There was a satisfactory progression of her fetal growth and no fetal abnormalities.
7. Sometime in July or August 1998, plaintiff began to have problems with headaches, nausea and body aches. By October 1998 the headaches had become severe, but she did not want to take medication for them due to her pregnancy.
8. Shortly before noon on 6 October 1998, Dwight Danner, plaintiff's coworker, noticed that a gasoline powered generator in the building had been running all day and he decided to call the fire department and ask them to check the building for carbon monoxide levels. Mr. Danner had not received any complaints from anyone working in the building.
9. Captain Gary Ramsey of the Asheville Fire Department arrived sometime around noon and took readings in the various parts of the building. Captain Ramsey recorded carbon monoxide readings of 23 parts per million in the communications room, 26 parts per million in police information, 25.4 parts per million in records, and 86 parts per million in the shop area where the gasoline generator was located. Captain Ramsey instructed the contractor to move the gasoline powered equipment out of the building.
10. Additional readings were taken at approximately 4:00 p.m. on 6 October 1998 and were found to be 1 part per million in the communications room, 0 in police information, 0 in records, and 45 parts per million in the shop area.
11. The levels of carbon monoxide exposure which have been determined to be acceptable in the workplace without undue consequences to an employee who is in that environment for eight hours a day, five days a week, are listed at 50 parts per million under OSHA guidelines, which are also followed by the North Carolina Department of Labor. These guidelines establish an average, meaning that if an employee is exposed to levels of 100 parts per million for a four hour period, the next four hours must be at a 0 level in order to maintain the 50 parts per million average. The guidelines establish a level of 400 parts per million that should not be exceeded for more than 15 minutes at a time, and a ceiling of 1500 parts per million that an employee should not be exposed to for any amount of time.
12. Due to the renovations taking place in the building, there were some holes in the walls and vacant pipe shafts which permitted some ventilation of air from one area to another in the building, accounting for the carbon monoxide readings in areas where there was no direct source of carbon monoxide. Plaintiff did not work in the shop area of the municipal building. In order to get to the restrooms or the snack machines, plaintiff had to exit the communications room and enter a hallway that bordered the shop area, but she did not have to enter the shop area at any time.
13. Close to the end of the day of 6 October 1998, plaintiff learned that carbon monoxide had been detected in the building. She was not familiar with the effects of the gas but contacted her doctor the next day. Plaintiff's doctors did not order testing of carbon monoxide levels in plaintiff's blood until after the carbon monoxide would have been naturally eliminated from her system. Consequently, her carbon monoxide level as of 6 October 1998 could not be determined. On 15 October 1998, plaintiff was sent to Dr. Rardin, a neurologist, regarding her severe headaches. Her neurologic examination was normal and the MRI of her head was reported to be normal. Dr. Rardin concluded that she probably had tension vascular headaches which were not likely to be related to her exposure to carbon monoxide.
14. On 26 October 1998, plaintiff saw Dr. Cabaniss and informed her of the carbon monoxide exposure. Dr. Cabaniss noted a mild growth lag in the baby since the previous examination in September. Since a fetus is more susceptible to carbon monoxide than the mother, Dr. Cabaniss recommended that plaintiff be excused from work until the baby was born. Dr. Cabaniss was not aware of any specific information regarding plaintiff's workplace or the readings that were taken on 6 October 1998 or subsequent to that date. Her recommendation was based solely upon plaintiff's statement and the general medical knowledge of Dr. Cabaniss.
15. Plaintiff did not return to work after her expected maternity leave because she did not trust her employer to maintain a safe working environment for her, and she was able to obtain extensions to her leave. Plaintiff eventually returned to her previous employment on 10 August 1999.
16. Dr. J. Paul Martin, an expert in the field of occupational medicine and in obstetrics and gynecology, was employed by defendant as the medical director of Employee Health Services. He examined the recorded levels of carbon monoxide in plaintiff's workplace and opined that the levels were well within the OSHA guidelines and did not represent a risk to plaintiff absent her spending eight hours in the enclosed shop area while the generator was running. He further opined that even had plaintiff walked through the shop area from time to time in order to reach the restrooms or take breaks, she would have not been exposed to risk. Lastly, Dr. Martin opined that there is no evidence that the levels of exposure suffered by plaintiff would have placed her fetus at risk, and that the growth lag suffered by the fetus could have been caused by plaintiff's insulin-diabetic condition.
17. Plaintiff's claim for workers' compensation benefits alleges that she was rendered disabled due to her exposure to carbon monoxide at work. Plaintiff has not offered any medical evidence that she was ever diagnosed with carbon monoxide poisoning or that, under the circumstances of the case, she probably had carbon monoxide poisoning. Despite a clear exposure to some level of carbon monoxide and symptoms consistent with carbon monoxide poisoning, the Industrial Commission cannot make that diagnosis. There were other potential causes for her symptoms.
18. Although plaintiff proved that she was exposed to carbon monoxide in her employment with defendant, she did not prove that she developed carbon monoxide poisoning or that there was any resulting disability.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Carbon monoxide poisoning is a named occupational disease and is therefore a compensable condition. N.C. Gen. Stat. § 97-53 (22).
2. Although plaintiff was exposed to carbon monoxide in her employment and developed symptoms consistent with carbon monoxide poisoning, she did not prove that she actually developed carbon monoxide poisoning, or that she sustained any disability as a result. N.C. Gen. Stat. § 97-53
(22); Click v. Pilot Freight Carriers, Inc., 300 N.C. 164, 265 S.E.2d 389
(1980).
3. Plaintiff is not entitled to benefits under the Workers' Compensation Act based upon carbon monoxide exposure. N.C. Gen. Stat. § 97-2 et seq.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. This claim must, under the law, be and it is hereby DENIED.
2. Each side shall pay its own costs.
This the ___ day of November, 2001.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER